# The Wm. H. Payne.

## The Vanderbilt.

*(District Court, S. D. New York.   June 11, 1884.)*

1. **Collision—Tug and Tow—East River.**
   A steam-tug has a right to remain stationary in the East river, or nearly so, while making up a tow in the usual place, leaving room for vessels to pass on either side.

2. **Same—Answering Signals.**
   An assenting response of two whistles to a previous signal of two whistles from another tug imposes on the former no duty to move away to the left, and she is not liable for a collision, unless fault in her management be proved.

3. **Same—Crossing Bows.**
   Where the steam-tug V. was making up a tow of canal-boats opposite piers 4 to 8, East river, about one quarter of the distance across from the New York shore, heading against a strong flood-tide and remained nearly stationary by frequent turns of her engine, and the steam-tug W. H. P., with four canal-boats in tow, two lashed upon each side of her, came round the Battery from the North river, about 400 feet from the shore, and the tugs, when first seen by each other, exhibited each to the other her red light a little on the port bow, and the W. H. P., instead of keeping to the right, with the set of the tide, and towards the middle of the river, where she was required by statute to go, gave a signal of two whistles to the V., to which the V. replied with two, and the W. H. P. thereupon crossed the bows of the V. to go between her and the New York shore, and in so doing the port quarter of her starboard tow struck the bows of the V., the latter having backed in the mean time as far as safe towards her own tow, *held*, the collision was solely the fault of the W. H. P., in going to the left rather than to the right, caused by miscalculation of either the distance of the V. or of the sweep of the flood-tide.

In Admiralty.

*Edwin G. Davis*, for libelant.

*Ludlow Ogden*, for Orient Mut. Ins. Co.

*Jas. K. Hill, Wing & Shoudy*, for the Wm. H. Payne.

*Owen & Gray*, for the Vanderbilt.

Brown, J.   The libel in this case was filed by the owner of the canal-boat Willis, in tow of the steam-tug Wm. H. Payne, to recover damages sustained by a collision with the steam-boat Vanderbilt, in the East river, on the evening of September 20, 1880.   The Willis, with her cargo of 235 tons of coal, sank almost immediately after the collision, and the owners and insurers of the cargo have intervened for their interests.

The Vanderbilt, a powerful steamer about 300 feet long, was engaged in making up a tow of canal-boats in the East river, abreast of piers 4 to 8.   Her witnesses describe her as lying about midway in the river; but I am satisfied from the evidence that she was not more than a quarter of the distance across from the New York shore.   At the time of the collision there were about four or five tiers of canal-boats, four in each tier, already attached, and others still remained to be added.   The tide was about half flood, and strong, running from two to three miles an hour.   The Vanderbilt had a hawser about 100 feet long between her stern and the head tier of the tow.   She had

been thus engaged from an hour to an hour and a half prior to the collision, and maintained her position, heading against the tide, without substantial change, by the frequent movement of her engines a few turns forward, followed by short stops.

The Payne left pier 4, North river, bound up the East river, with four canal-boats in tow, two lashed upon each side. The Willis was the outer boat on the starboard side. She proceeded around the Battery, within about 400 feet of the New York shore, and about the same distance from the barge-office beyond, when she perceived the Vanderbilt, which was, as I find, off about pier 4, and gave her a signal of two whistles, indicating that she would go between her and the New York shore. This signal was not answered by the Vanderbilt, being either not perceived, or misunderstood; for at the same time one of the Hamilton ferry-boats was approaching towards her slip on the New York shore, between the Vanderbilt and the Payne; and almost immediately after the Payne's signal the ferry-boat gave one whistle, indicating that she would go ahead of the Payne. The latter replied with one whistle, and immediately slowed her engines for three or four minutes, and allowed the ferry-boat to pass ahead into her slip. Immediately afterwards the Payne repeated her signal of two whistles to the Vanderbilt, whose two colored lights were then visable still a little on the Payne's port bow, and that signal was immediately answered by two from the latter. The Payne put her wheel hard a-starboard, to go between the Vanderbilt and the New York shore, but did not quite clear the Vanderbilt. The port quarter of the Willis, a few feet from her stern, struck a glancing blow against the Vanderbilt's bows, causing the former injuries, from which she sank a few minutes afterwards.

The libelant's witnesses contend that the Vanderbilt was moving forward at the time of the collision, and was in fault for not going to port, according to the mutual signals of two whistles. The weight of evidence, however, satisfies me that the Vanderbilt had not commenced her trip at the time of the collision. She had made no forward movements, except the occasional turns of her wheel necessary to maintain her position against the tide; and after the signal of two whistles she backed and came as near to the head of her own tow as was safe. The men on board the latter shouted that she would be into them; she then started up her engines sufficient to prevent a collision with her own tow, and the collision with the Willis happened at about the same moment, while the Vanderbilt was still close to her own tow. Upon these facts I cannot doubt that the prime cause of the collision was the Payne's undertaking to cross the bows of the Vanderbilt, and to go to the left, between her and the New York shore, instead of keeping to the right, towards the middle of the river, where there were no obstructions, but plenty of room, and where the state statute required her to go. As the Payne passed the barge-office only the red-colored light of the Vanderbilt was visible a little on her

port bow, and only the Payne's red light was at the same time visible to the pilot of the Vanderbilt a little on his port bow. The situation, therefore, plainly required the Payne to go to the right. Some witnesses from the latter testify that the Vandebilt was headed towards the ferry slip. If this were so it would render going to the left still more imprudent. The witnesses from the Vanderbilt say she was headed towards Castle William. It is probable, however, that she was headed nearly against the tide, which would make her pointing somewhat to the westward of Castle William. The flood-tide from the barge office to pier 2 sets strongly towards the Wall-street ferry, on the Brooklyn shore, and in my judgment the collision was caused through the miscalculation of the pilot of the Payne, either as to the distance of the Vanderbilt, or the effect of the flood-tide in sweeping the Payne towards the Brooklyn shore, when he undertook to pass the Vanderbilt to the left. That he miscalculated somewhat the distance of the Vanderbilt seems probable from his testimony that when first seen he judged her off pier 8, whereas she was not far from pier 4.

The local inspectors' rules required the Payne to pass to the right, but permitted, for good reason, going to the left on proper signals. There was not in this case any good reason, so far as the evidence shows, for the Payne's going to the left. As I have said, each, when first seen, exhibited to the other her red-colored light only, and on the port bow of each. Three-fourths of the East river was available to the Payne on the right. The tide set to the right, and every consideration of prudence, as well as the statute, required her to pass that way. Her course to the left must, therefore, be held to have been at her own risk, unless it be shown that the collision arose through some fault of the Vanderbilt.

Careful examination of the evidence fails to satisfy me that any fault is shown in the management of the Vanderbilt. She was engaged in the legitimate business of making up her tow, in a place in the river where it was usual to make up such tows, and abreast of the docks specially devoted by statute to the use of canal-boats. She was sufficiently far from the New York shore to enable boats to pass inside of her that had any legitimate business there, or that needed to land at those docks. She was not in the middle of the river, where other steam-boats were, by statute, required to go, and hence offered no obstructions to their passage there. She was, therefore, in the most proper place for her work of making up her tow; and she was as nearly stationary by land as was practicable in heading a strong flood-tide. During all the time she was there her engine was worked by the engineer by hand. Her response of two whistles to the Payne's signal of two was a proper response; because there was no obstruction to the Payne's passing to the left, if she had any business which called her inside. The rules required the Vanderbilt to respond to the Payne's signal; and the response given meant only that she acquiesced in the Payne's proposed course, and would

do nothing to embarrass her. *The Garlick, ante,* 647. It did not mean that the Vanderbilt would leave her business and pull away to the left, in order to avoid the Payne. In acquiescing in the Payne's signal, the pilot of the Vanderbilt had the right to assume that the Payne had sufficient power and speed to pass to the left as proposed, if the former did nothing to embarrass her. Afterwards, when he saw the Payne's green light approaching rapidly with the sweep of the tide, he backed the Vanderbilt as far as possible; and the weight of evidence shows that the turn of the engines forward, made just before the collision, was only what was necessary to prevent a collision with the Vanderbilt's own tow. In that position, and under those circumstances, no mere change of the helm of the Vanderbilt, at the last moment, could have been of any avail in avoiding the collision. There was sufficient room to pass on the New York side, as is shown clearly by the fact that the Payne did afterwards pass inside, about 75 feet from the tow; so that the Vanderbilt was not called on either to give dissenting signals or any signals of danger. It must be inferred from the evidence that the pilot of the Payne either knew that the Vanderbilt was not under way, but only engaged in making up a tow, or else that she was very probably doing so; because the pilot of the Payne was familiar with the business of the Vanderbilt, and the making up of tows in that region, and, as he testifies, he noticed canal-boats moving about there.

I am obliged to hold, therefore, that the course of the Payne in going to the left was wholly at her own risk; that there was no fault in the Vanderbilt; and consequently that the libel against the latter must be dismissed, with costs, and a decree, with costs, directed against the Payne. A reference may be taken to compute the amount.